# Third District Court of Appeal

## State of Florida

Opinion filed July 23, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-1382
Lower Tribunal No. 11-1364

_____

**City of Miami,**
Appellant,

vs.

**Cheryl K. Haigley, individually and on behalf of all others similarly situated,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Marc Schumacher, Judge.

Victoria Méndez, City Attorney, and John A. Greco, Deputy City Attorney, Warren Bittner, Deputy Emeritus, and Forrest L. Andrews, Assistant City Attorney, for appellant.

Eaton & Wolk, and William G. Wolk; Freidin Dobrinsky Brown & Rosenblum, P.A., and Eric Bluestein, for appellees.

Before ROTHENBERG, SALTER, and LOGUE, JJ.

ROTHENBERG, J.

The City of Miami ("City") appeals the trial court's final summary judgment, which struck down a provision in section 2-234 of the City of Miami Code that requires non-residents of the City to pay $100 more than residents of the City who use the City's emergency medical transportation services ("non-resident surcharge.").[1] The trial court struck the non-resident surcharge, finding in part that it is an unauthorized tax, not a user fee, and that even if the higher fee charged non-residents for the use of the City's emergency medical transportation services constitutes a user fee, it must be stricken because it violates the plaintiffs' rights to equal protection under Florida's Constitution and unconstitutionally impairs intrastate travel. Because we conclude that the fee charged non-City residents who use the City's emergency medical transportation services is a user fee, not a tax, and it does not violate the constitutional guarantee of equal protection or unconstitutionally burden intrastate travel, we reverse the trial court's order entering final summary judgment in favor of Cheryl K. Haigley, individually and on behalf of all others similarly situated ("the plaintiffs"), and remand with directions to enter final summary judgment in favor of the City.

_____

[1] The City also appealed an order granting class certification and an order granting the plaintiffs' motion to amend the summary judgment order. As the City has not raised any issues relating to these orders, we conclude that the City has abandoned any issues concerning these orders. See City of Miami v. Steckloff, 111 So. 2d 446, 447 (Fla. 1959) ("An assigned error will be deemed to have been abandoned when it is completely omitted from the briefs."); N.W. v. Dep't of Children & Families, 865 So. 2d 625, 626 (Fla. 4th DCA 2004) (holding that issues not raised in the initial brief are deemed abandoned).

## HISTORICAL BACKGROUND OF THE CITY'S EMERGENCY MEDICAL TRANSPORTATION SERVICES FEE

In 1992, because "the cost of providing the highest possible fire safety and prevention services [was] steadily rising," the City passed Ordinance 11007, which amended section 2-83.1 of the City of Miami Code. The ordinance increased the fees charged those who use the emergency medical transportation services provided by the City's Fire-Rescue Department. The ordinance, which is now codified in section 2-234 of the City of Miami Code, provides:

**Sec. 2-234. Emergency medical transportation service fee.**
(a) There is hereby established a schedule of fees for use of the emergency medical transportation services of the department of fire-rescue. Such fees shall be charged to each person receiving basic and advance life support transportation service . . . ; such schedule of fees being as follows:
(1) Basic life support—Base rate …..$135.00
(2) Advance life support—Base rate…..235.21
(3) Oxygen …..22.00
(4) Mileage, per mile …..6.60
(5) IV solution …..22.00
(6) Cardiac monitoring …..22.00
(7) Cervical collar …..22.00
(8) Special handling (extrication, antishock trousers, nonbreathing patients and hare-traction splints) …..22.00
(9) Nonresidents of the City of Miami will be assessed a surcharge of …..100.00.
(b) The city manager shall increase the charges for services as set forth in this section when necessary to reasonably cover the cost of providing such services. Whenever such charges are to be increased, the city manager shall file a list of new charges which shall become effective no earlier than 30 days after such filing with the city clerk.

The City currently charges residents and non-residents who use the City's emergency medical transportation services in accordance with the fee schedule set forth in section 2-234(a)(1)-(9). The collected emergency medical transportation services fees are deposited into the City's General Fund.

**FACTS AND PROCEDURAL HISTORY OF THE PRESENT CASE**

In March 2010, Cheryl K. Haigley ("Haigley"), a resident of St. Petersburg Beach, Florida, fell and injured herself while in the City of Miami. The City's Fire-Rescue Department responded, and Haigley was transported to a local hospital. The City billed Haigley a total of $445—a $330 "base rate" for "basic life support"[2] services, $15 for mileage, and a $100 non-resident surcharge.[3] Haigley paid the bill in full.

In January 2011, the plaintiffs filed an action against the City, seeking a declaration that the City's non-resident surcharge is unconstitutional because it violates the right to intrastate travel and the guarantee of equal protection secured by the Florida Constitution (Count I) and because the surcharge is an unauthorized tax, not a user fee (Count II). The plaintiffs sought the return of all non-resident surcharges collected by the City during the four years preceding the filing of the action.

---

[2] See § 401.23(7), Fla. Stat. (2013) (defining "basic life support"); § 401.23(1), Fla. Stat. (2013) (defining "advanced life support").

[3] The fees listed in section 2-234(a) have since been increased pursuant to section 2-234(b).

The plaintiffs and the City filed cross-motions for summary judgment. The trial court denied the City's motion, entered final summary judgment in favor of the plaintiffs, and struck down the provision in section 2-234(a)(9) that establishes the additional non-resident surcharge. The trial court also enjoined the City from further collection of the non-resident surcharge and ordered the City to reimburse the plaintiffs for all non-resident surcharges collected during the four years preceding the filing of the action. The City's appeal followed.

## STANDARD OF REVIEW

Our standard of review of an order granting summary judgment is de novo. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000); Sierra v. Shevin, 767 So. 2d 524, 525 (Fla. 3d DCA 2000). Additionally, constitutional challenges to statutes or ordinances involve pure questions of law, and therefore, the plaintiffs' constitutional challenges are also reviewed de novo. See Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So. 2d 492, 500 (Fla. 2003); Kuvin v. City of Coral Gables, 62 So. 3d 625, 629 (Fla. 3d DCA 2010).

## ANALYSIS

**I. Are the Fees Charged to Non-City Residents Who Use the City's Emergency Medical Transportation Services a Tax or a User Fee?**

    **A. The Three-Prong Test to Determine whether the Charge is a Tax or a User Fee**

5

In State v. City of Port Orange, 650 So. 2d 1 (Fla. 1994), the Florida

Supreme Court established a three-prong test to determine whether a particular

charge is a user fee or a tax. Specifically, the Court held:

> [A] tax is an enforced burden imposed by sovereign right for the
> support of the government, the administration of law, and the exercise
> of various functions the sovereign is called on to perform. . . .
>      User fees are charges based upon the proprietary right of the
> governing body permitting the use of the instrumentality involved.
> Such fees share common traits that distinguish them from taxes: [1]
> they are charged in exchange for a particular governmental service [2]
> which benefits the party paying the fee in a manner not shared by
> other members of society, and [3] they are paid by choice, in that the
> party paying the fee has the option of not utilizing the governmental
> service and thereby avoiding the charge.

Id. at 3 (internal citations omitted); see also Collier Cnty. v. State, 733 So. 2d 1012,

1018, (Fla. 1999) ("[U]ser fees are similar to special assessments, in that the fee

must result in a benefit not shared by persons not required to pay the fee."); State

ex rel. Gulfstream Park Racing Ass'n v. Fla. State Racing Comm'n, 70 So. 2d 375,

379 (Fla. 1953) ("In common parlance a tax is a forced charge or imposition, it

operates whether we like it or not and in no sense depends on the will or contract

of the one on whom it is imposed."); City of Miami v. Quik Cash Jewelry & Pawn,

Inc., 811 So. 2d 756, 758-59 (Fla. 3d DCA 2002). Therefore, in the instant case, if

the emergency medical transportation services fee, which includes the non-resident

surcharge, satisfies the three-prong test, it is a user fee, not a tax.

    (1) *The fee the City charged Haigley was in exchange for a particular governmental service provided to her by the City*

6

Haigley argues, and the trial court found, that the City did not provide her with a particular governmental service in exchange for the $100 non-resident surcharge. Haigley's argument is fatally flawed.

It is undisputed that the City provided Haigley with a particular governmental service. The City's Fire-Rescue Department transported Haigley to a medical facility for emergency treatment. The charge assessed for this service was assessed solely to Haigley, not to a non-user of the emergency medical transportation services. Thus, the $445 the City charged Haigley was in exchange for a particular governmental service.

The City provides the same emergency medical transportation services to City residents and non-residents. Section 2-234 merely charges residents and non-residents different rates for utilizing the emergency medical transportation services provided by the City's Fire-Rescue Department. Although the City charges residents and non-residents different rates for utilizing the same governmental service—emergency medical transportation services—non-residents are nonetheless receiving a particular governmental service in exchange for the fee charged by the City. In other words, Haigley was not charged a fee for the mere **availability** of the service, but rather for the service that was actually provided to her. Accordingly, we conclude that the City established the first prong set forth in City of Port Orange.

7

(2) *The emergency medical transportation services benefited Haigley in a manner not shared by other members of society*

In addressing the second prong set forth in <u>City of Port Orange</u>, the trial court concluded:

> The City of Miami non-resident surcharge does not provide a benefit to non-residents in a manner not shared by other users of the City of Miami emergency medical services. Even if the City uses most of the non-resident surcharge money collected to pay for a portion of the overall cost of providing Fire Rescue transportation services *to everyone*, the surcharge does not benefit the non-residents paying the charge *in a manner not shared by others,* which is the essence of the second prong of the Supreme Court's <u>City of Port Orange</u> user fee test.

The trial court unfortunately focused on whether the non-resident **surcharge** benefitted Haigley in a manner not shared by other members of society, rather than focusing on whether the emergency medical transportation **services** provided by the City benefitted Haigley in a manner not shared by other members of society. As to the emergency medical transportation services provided to Haigley by the City, the answer is obvious—the services Haigley received from the City's Fire-Rescue Department solely benefitted her. No other member of society received or was billed for the services provided to Haigley.

In <u>Quik Cash Jewelry</u>, 811 So. 2d at 759, this Court reversed the trial court's order finding that the fees imposed by the City on pawnshop operators were unconstitutional. This Court, however, found that the fees were user fees, not taxes, because the fees benefitted pawnshop owners in a manner not shared by

8

others. In reaching this conclusion, this Court specifically noted a decision rendered by the Arizona Supreme Court, which held in part as follows:

> We think it is clear that the payment which plaintiff is seeking to recover is in no sense a tax, but is rather a fee. In the first place, the necessity of its payment does not arise unless and until the individual requests the public authority to perform some particular service. So long as the service is not asked, the money will never be demanded. In the second place, the service which is requested of the defendant is one which obviously and admittedly will confer a particular benefit on plaintiff alone, and upon no other person, natural or artificial. We hold, therefore, that the amount in controversy was collected from plaintiff as a fee and not as a tax, and as such is not subject to the constitutional inhibitions imposed upon taxes, but rather to such as may exist as against fees.

Quik Cash Jewelry, 811 So. 2d at 759 (footnote omitted) (quoting Stewart v. Verde River Irrigation & Power Dist., 68 P.2d 329, 334 (Ariz. 1937)). Similarly, Haigley paid directly for the emergency medical transportation services provided to her and her alone. Thus, the second City of Port Orange prong is also satisfied.

(3) *Haigley paid the emergency medical transportation services fee by choice*

In addressing whether Haigley paid the emergency medical transportation services fee "by choice," we must determine whether Haigley, as the party paying the fee, had "the option of not utilizing the governmental service and thereby avoiding the charge." City of Port Orange, 650 So. 2d at 3; see also Quik Cash Jewelry, 811 So. 2d at 758 ("[O]ne can avoid a user fee by not seeking the governmental service for which it is charged."). Of the three prongs set forth in

9

<u>City of Port Orange</u>, this prong is considered the least significant. See <u>I-4 Commerce Ctr., Phase II, Unit I v. Orange Cnty.</u>, 46 So. 3d 134, 136 (Fla. 5th DCA 2010) (noting that of the three requisite traits for a valid user fee set forth in <u>City of Port Orange</u>, the "most significant of these traits" are the first two).

In <u>Gargano v. Lee County Board of County Commissioners</u>, 921 So. 2d 661, 667-68 (Fla. 2d DCA 2006), the Second District Court of Appeal specifically addressed this third prong—whether the fee is paid "by choice." In <u>Gargano</u>, the issue was whether the toll charged to cross the bridge to or from Sanibel or Captiva Island in Lee County, Florida, was a user fee or a tax. Ms. Gargano argued that because she did not own a boat or a helicopter, and the only way she could reach her home on Sanibel Island was by using the bridge, she had no choice but to pay the toll, and thus, the toll constituted a tax. In rejecting this argument, the Second District stated the following:

> It is true that anyone who lives on Sanibel Island or Captiva Island and does not own a boat or helicopter must pay this toll to reach their home from the mainland. This is not a situation in which the traveler has other, longer roadways to reach the same location. However, the concept of "choice" for defining user fees is designed to distinguish a tax whose payment can be compelled from charges for services that one can avoid. Ms. Gargano can live elsewhere in Lee County. She can choose to stay on the island and not visit the mainland. The County cannot compel her to use the bridge or pay the fee. **As a practical matter, she may not see many available options, but as a legal matter this charge is not a tax.**

10

Id. at 668 (emphasis added). As the Second District aptly recognized: "Many user fees are similar in that a true choice does not exist. One cannot realistically choose to forego water or sewer service to a home or avoid user fees for garbage pickup. . . . These realities do not transform the charges for these services into taxes." Id. at 668 n.4.

Haigley clearly had a choice. The record reflects that she was conscious and not otherwise incapacitated when she was transported to the local hospital by the City's Fire-Rescue Department. Haigley, therefore, was able to elect whether to use the emergency medical transportation services offered by the City's Fire-Rescue Department.

Nonetheless, the incapacitation of an individual who may not be able to communicate with the City's Fire-Rescue personnel would not require a finding that the non-resident user of the City's emergency medical transportation services had no choice. As explained in Gargano, an individual can choose whether or not to enter a particular city. The choice is hers to make, not the City's. The City does not bar non-residents from entering or require that they use the City's emergency medical transportation services in the event they suffer an unfortunate accident, illness, or injury, and the City will provide the same emergency medical transportation services to residents and non-residents alike.

11

As the Second District noted in <u>Gargano</u>, while the option may not appear to be a realistic one, it is nonetheless an **available** option. Haigley's choice whether or not to enter the City does not differ from that of Ms. Gargano, who had to choose whether to move from Sanibel Island, never leave Sanibel Island to enter the mainland, or pay the toll to travel to and from Sanibel Island. Haigley's choice is certainly an easier and more realistic one to make than Ms. Gargano's choice or the choice to forego water and sewer services to avoid a service fee. The City has, therefore, established the third prong set forth in <u>City of Port Orange</u>.

Because the non-resident surcharge satisfies the three-prong test set forth in <u>City of Port Orange</u>, it is a user fee, not a tax. We now address the plaintiffs' remaining arguments.

B. **The Transfer of the Collected Fees into the City's General Fund**

Haigley contends that because the emergency medical transportation services fees collected by the City are placed into the City's General Fund, they are converted into a tax. However, the Florida Supreme Court in <u>Crist v. Ervin</u>, 56 So. 3d 745 (Fla. 2010), has already rejected this argument. In <u>Crist</u>, the Florida Supreme Court addressed whether several statutes that require that a portion of civil action filing fees be transferred into the State of Florida's general revenue fund imposed an unconstitutional tax and denied access to courts. The Florida Supreme Court, relying in part on <u>City of Port Orange</u>, held that the statutes in

12

question did **not** constitute an unconstitutional tax on their face. <u>Id.</u> at 748.

Further, the Court found:

> [A] statutory filing fee is not considered an unconstitutional tax repugnant to court access if the fee is used to fund the costs of the administration of justice. There is no requirement in the Florida Constitution that the very money paid for filing fees be used to fund the administration of justice. Money is fungible. **Once the filing fees are commingled with other state money in the general revenue fund, the filing fees lose their separate character and become interchangeable with the other state money. Therefore, the Legislature would be using the filing fees to fund the administration of justice if it funds the justice system at a level at least equal to the amount of filing fees that is commingled with other state money in the general revenue fund.**

<u>Crist</u>, at 749 (emphasis added) (citations omitted). The Court also concluded that the statutes were constitutional as applied "[b]ecause the Legislature funded the cost of the administration of justice with far more than the amount of filing fees deposited into the general revenue fund." <u>Id.</u> at 750.

In the instant case, it is undisputed that the City's Fire-Rescue Department budget comes from the City's General Fund. The collected emergency medical transportation services fees, including the non-resident surcharge, are transferred into the City's General Fund, and the collected fees are used to help offset the cost of providing Fire-Rescue transportation services and to help defray the costs of purchasing, maintaining, and repairing the equipment necessary to provide the emergency medical transportation services set forth in section 2-234(a).

13

The City's costs to fund the Fire-Rescue Department substantially outweigh the amount collected under the surcharge. In 2010, the City spent nearly $8.2 million on Fire-Rescue services. Of that amount, only $42,000 came from non-resident surcharges—less than one percent of the total expenditure. Although the record is somewhat sparse, based on the City's responses and the limited financial information in the record, it is undisputed that the City funds its Fire-Rescue Department at a level far in excess of the amounts collected by the City through the fees it charges users of its emergency medical transportation services. Based on the analysis set forth in Crist, we conclude that the collected user fees, including the non-resident surcharges, are not transformed from a user fee into a tax simply because the collected fees are deposited into the City's General Fund.

**II. Does the Higher Rate Charged to Non-Residents Who Use the City's Emergency Medical Transportation Services Violate Florida's Constitutional Guarantee of Equal Protection or Burden the Fundamental Right to Intrastate Travel?**

The trial court also found that the non-resident surcharge, even if considered a user fee, violates Florida's equal protection clause and unconstitutionally burdens the fundamental right to intrastate travel. In performing our constitutional analysis, we begin, as we must, with our recognition that properly enacted acts of legislation, including ordinances, are presumptively constitutional. Kuvin, 62 So. 3d at 632 (holding that ordinances "enjoy a presumption in favor of constitutionality"); City of Pompano Beach v. Capalbo, 455 So. 2d 468, 469 (Fla.

14

4th DCA 1984) ("Because a municipal council, like the legislature, would not knowingly enact an unconstitutional measure, appellate courts will indulge every reasonable presumption in favor of an ordinance's constitutionality."); see also State v. Sawyer, 346 So. 2d 1071, 1072 (Fla. 3d DCA 1977). Accordingly, the party "challenging the constitutionality of an ordinance has the burden of proving its invalidity." Gates v. City of Sanford, 566 So. 2d 47, 49 (Fla. 5th DCA 1990); see also City of Miami Beach v. Texas Co., 194 So. 368, 377 (Fla. 1940) ("One attacking the validity of an ordinance has the burden of establishing its invalidity when such ordinance appears on its face to have been regularly enacted."). Haigley has not satisfied her burden for either of her constitutional challenges.

## A. **Equal Protection**

Haigley argued below, and the trial court found, that the application of section 2-234(a)(9), which provides for an additional fee to be paid by non-residents who use the City's emergency medical transportation services, violates Florida's constitutional guarantee of equal protection. Art. I, § 2, Fla. Const. We disagree.

The Florida Constitution's Equal Protection Clause provides, in relevant part: "All natural persons, female and male alike, are equal before the law . . . . No person shall be deprived of any right because of race, religion, national origin, or physical disability." Art. I, § 2, Fla. Const. "'Equal protection [however] is not

violated merely because some persons are treated differently than other persons. It only requires that persons similarly situated be treated similarly.'" Troy v. State, 948 So. 2d 635, 645 (Fla. 2006) (quoting Duncan v. Moore, 754 So. 2d 708, 712 (Fla. 2000)); see also Jackson v. State, 137 So. 3d 470, 474 (Fla. 4th DCA 2014) ("Equal protection does not require identity of treatment. It only requires that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate as to be wholly arbitrary." (quoting State v. Anderson, 208 So. 2d 814, 820 (Fla. 1968))). Indeed, all legislation classifies and discriminates against a distinct group of individuals: Florida's criminal laws discriminate quite harshly against murderers and thieves, while zoning ordinances may negatively impact large business owners. However, because the judiciary defers to the legislature to determine which groups and conduct to regulate, we uphold legislation that has "some rational relationship to a legitimate state purpose," id. (quoting Westerheide v. State, 831 So. 2d 93, 110 (Fla. 2002)), unless the legislation's classification is based on a suspect classification or a fundamental right. Estate of McCall v. United States, 134 So. 3d 894, 901 (Fla. 2014) ("Unless a suspect class or fundamental right protected by the Florida Constitution is implicated by the challenged provision, the rational basis test will apply to evaluate an equal protection challenge.")

The basis of Haigley's equal protection challenge is the disparate treatment between residents and non-residents of the City. However, residency (or non-residency) is not a suspect classification. See Art. I, § 2, Fla. Const. (defining the protected classes as "race, religion, national origin, or physical disability"). Accordingly, the rational basis test applies, and the ordinance will be upheld unless it has no rational and reasonable relationship to a legitimate state objective or it is found to be arbitrary or capricious.

When determining whether the legislation survives the highly deferential rational basis test, the first step is to "identify[] a legitimate government purpose which the governing body could have been pursuing." WCI Cmtys., Inc. v. City of Coral Springs, 885 So. 2d 912, 914 (Fla. 4th DCA 2004). "The second step of the rational basis test asks whether a rational basis exists for the enacting government body to believe that the legislation would further the hypothesized purpose." Id.

In passing Ordinance 11007, which increased fees related to emergency medical transportation services and added the non-resident surcharge, the Commission of the City of Miami recognized that the "City must increase specific fees in order to continue to provide said services." The distinction that the City's Commission has drawn between residents and non-residents by charging non-residents an additional $100 for their use of the City's emergency medical transportation services certainly "bear[s] some rational relationship to a legitimate

17

state purpose." Estate of McCall, 134 So. 3d at 927 (quoting Duncan v. Moore, 754 So. 2d 708, 712 (Fla. 2000)). Namely, through the payment of ad valorem taxes, the City's residents have already contributed to the funding of the City's Fire-Rescue Department. Residents pay for the services provided by the City's Fire-Rescue Department regardless of whether or not they ever use these services. Residents who use the City's emergency medical transportation services are charged a user fee **in addition to the ad valorem taxes they have already been assessed to ensure the availability of such services**. Requiring non-residents, who use and personally benefit from the service provided to them by the City, to pay an additional $100 for the service furthers the City's interest of being able to continue providing emergency transportation services to everyone in need of the services, regardless of whether the person is a resident or a non-resident.

The City's residents, users and non-users of emergency medical transportation services alike, more than make up for the additional $100 surcharge charged non-resident users by contributing a far greater amount to the City's overall emergency services budget. The base rate paid by individuals using the City's emergency medical transportation services is insufficient to cover the total cost, and the City could have properly determined that an extra $100 was necessary to offset that additional cost since non-residents do not contribute through the

18

payment of ad valorem taxes. Thus, the ordinance satisfies the rational basis test, and therefore, there is no equal protection violation.

The trial court below relied heavily on <u>Hamilton v. Collins</u>, 154 So. 201 (Fla. 1934), and <u>Harper v. Galloway</u>, 51 So. 226 (Fla. 1909), to support its conclusion that the ordinance violated the principles of equal protection. In <u>Hamilton</u>, the Florida Supreme Court found that the ordinance in question violated equal protection by allowing bread and pastry merchants with an established place of business within the city to pay a lower fee for their business license than bread and pastry merchants who did not have an established place of business within the city. <u>Hamilton</u>, 154 So. at 283-84. Similarly, in <u>Harper</u>, the Florida Supreme Court struck down a local Marion County game law requiring non-residents of Marion County to provide notice and pay a license fee to hunt game in Marion County. <u>Harper</u>, 51 So. at 228-29.

These cases, however, are distinguishable because they involve the payment of fees for a license to engage in independent activities (carrying on business and hunting) rather than the payment of a user fee for a service provided directly by the government (emergency medical transportation services). Additionally, although, <u>Harper</u> and <u>Hamilton</u> have not been explicitly overruled, their holdings and rationale predate the 1937 shift away from the courts' laissez-faire attitude towards legislation, which heavily scrutinized economic regulations. See <u>Nat'l Fed'n of</u>

19

Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2609 (2012) (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("Since 1937, our precedent has recognized Congress' large authority to set the Nation's course in the economic and social welfare realm."); see also Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n, 110 F.3d 547, 554-55 (8th Cir. 1997) (explaining that prior Supreme Court holdings, although never explicitly overruled, were no longer instructive based on the Court's shift in economic jurisprudence following the Lochner era in 1937); Sasso v. Ram Prop. Mgmt., 431 So. 2d 204, 211-216 (Fla. 1st DCA 1983) (discussing the history and evolution of both the federal and Florida equal protection clauses).

The City had legitimate objectives and a rational basis for passing the ordinance. Thus, the plaintiffs have been provided equal protection under the law.

## B. **Intrastate Travel**

In State v. J.P., 907 So. 2d 1101, 1113 (Fla. 2004), the Florida Supreme Court concluded that the "right to intrastate travel in Florida is clear." The Court poetically recognized that:

> Hailing a cab or a friend, chatting on a public street, and simply strolling aimlessly are time-honored pastimes in our society and are clearly protected under Florida as well as federal law. *All Florida citizens* enjoy the inherent right to window shop, saunter down a sidewalk, and wave to friends and passersby with no fear of arrest.

Id. (emphasis in original) (quoting Wyche v. State, 619 So. 2d 231, 235 (Fla. 1993)). Thus, the Florida Supreme Court in J.P. examined the burden placed on a juvenile's right to privacy, freedom to associate with persons of his or her own choosing, and freedom of movement when determining the constitutionality of an ordinance establishing a curfew for juveniles. Id.

We conclude that the fee charged non-residents who use the City's emergency medical transportation services does not implicate the right to intrastate travel. The City's ordinance does not burden a non-resident's right to enter or freely move throughout the City. Rather, the challenged ordinance merely charges non-residents an additional $100 for emergency medical transportation services if they utilize such services when visiting the City. Unlike the curfew ordinance in J.P. that prohibited juveniles from being in or remaining in a public place between the hours of 11:00 p.m. and 6:00 a.m. and provided criminal sanctions for violations of the ordinance, the City's surcharge in the instant case does not legally or practically restrict a non-resident's right to move about the state of Florida or the City.

Historically, the cases in which the right to travel has been implicated generally involve residency requirements that burdened the right to migrate. The United States Supreme Court has consistently distinguished between requirements applied differently between residents and non-residents, and requirements such as

21

durational requirements or determinations made based on the time the individual migrated into the state.

> We have always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and nonresidents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State.

Attorney Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 904 n.3 (1986).

Whereas durational residency requirements that deprive new residents of important benefits or penalize new residents for exercising their rights to migrate have been struck down, bona fide residence requirements have been found not to burden or penalize interstate (or intrastate) travel, because any person is free to move to a state (or city) to establish residence there. For example, the United States Supreme Court has found that even a temporary deprivation of life's necessities or important rights by a durational residency requirement may unconstitutionally penalize migration. See Dunn v. Blumstein, 405 U.S. 330, 333 (1972) (concluding that a durational residency requirement to establish the eligibility to vote was an unconstitutional burden on the right to migrate).

Conversely, residency requirements that are uniformly applied and which protect the services provided to state or city residents have generally been found not to burden or penalize interstate (or intrastate) travel.

> A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring

22

> that services provided for its residents are enjoyed only by residents. . . . [Such a requirement] does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there.

Martinez v. Bynum, 461 U.S. 321, 328-29 (1983) (footnotes omitted). For example, in Baldwin v. Fish & Game Commission of Montana, 436 U.S. 371, 391-92 (1978), the United States Supreme Court found constitutional Montana's recreational hunting licensing laws that limited the number of hunting licenses made available to non-residents and required non-residents to pay a higher fee for such license than Montana residents.

The City's ordinance in the instant case does not in any way restrict a non-resident's right to enter or move throughout the City or the state of Florida. The City's emergency medical transportation services are readily available to residents and non-residents alike. Thus, the City's ordinance does not unconstitutionally burden intrastate travel.

**CONCLUSION**

The City's emergency medical transportation services fee, including the $100 non-resident surcharge, is a user fee—not a tax—because it satisfies the three-prong test set forth in City of Port Orange. The City's ordinance is a valid user fee as it does not violate the constitutional guarantee of equal protection or unconstitutionally burden intrastate travel. Accordingly, we reverse the trial

23

court's order entering final summary judgment in favor of the plaintiffs and remand with directions to enter final summary judgment in favor of the City.

Reversed and remanded with directions.